UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| **In re:** | | Filed & Entered |
| **SUSAN L. CONGDON,** | Chapter 7 Case | On Docket |
| Debtor. | # 05-11512 | 03/29/07 |
| | | |
| **SUSAN L. CONGDON,** | | |
| Plaintiff, | | |
| v. | Adversary Proceeding | |
| | # 06-1034 | |
| **EDUCATIONAL CREDIT** | | |
| **MANAGEMENT CORPORATION,** | | |
| Defendant. | | |

| *Appearances:* | Rebecca A. Rice, Esq. | Gary L. Franklin, Esq. |
|---|---|---|
| | Cohen & Rice | Primmer Piper Eggleston & Cramer, P.C. |
| | Rutland, VT | Burlington, VT |
| | For the Plaintiff | For the Defendant |

**MEMORANDUM OF DECISION**
**OVERRULING DEFENDANT'S OBJECTION TO ADMISSIBILITY OF ALJ REPORT**
**AND GRANTING JUDGMENT IN FAVOR OF THE DEFENDANT**

Plaintiff Susan Congdon (the "Plaintiff" or "Congdon") initiated the instant adversary proceeding against the Educational Credit Management Corporation[1] (the "Defendant" or "ECMC") for a determination of whether her student loans may be discharged. The Court conducted a trial on February 6, 2007 and took the matter under advisement. The Court also took under advisement an evidentiary issue raised by the parties with respect to the admissibility of an Administrative Law Judge ("ALJ") decision entered in connection with the Plaintiff's application for Social Security Disability benefits. For the reasons set forth below, the Court determines that the ALJ report is admissible. The Court also holds that the Plaintiff has failed to meet her burden under the test enunciated by the Second Circuit in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987), and therefore the Plaintiff's student loan obligations may not be discharged.

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 157(b)(2)(I). It is undisputed that this adversary proceeding is a core proceeding.

---
[1] In her complaint, Plaintiff named Vermont Student Assistance Corp. as the defendant (doc. #1). By Order entered June 21, 2006, the Court granted Defendant's motion to substitute Educational Credit Management Corp. as the party defendant (doc. # 8).

## THE FACTS

On September 27, 2005, Congdon filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. An Order Discharging the Debtor was entered on January 10, 2006, and her case was closed approximately two weeks thereafter. In March 2006, Congdon moved to reopen her case, and on April 25, 2006 she initiated this adversary proceeding seeking to discharge the student loan obligations she owes to ECMC. The parties have stipulated to the following facts:

1. Congdon, age 54, resides in Rutland, Vermont in subsidized housing.
2. Congdon received a bankruptcy discharge in January 2006.
3. Congdon has two grown children and no dependents.
4. In December 2000, Congdon executed a Consolidated Promissory Note (the "Note") in the amount of $81,015.21, which "consolidated various student loans taken for Ms. Congdon and her two children to attend college during 1994 to 1999."
5. ECMC is now the holder of the Note.
6. The loan balance on the Note as of May 25, 2006 was $134,843.70 with interest accruing at the rate of 8.25% per annum.
7. Congdon began psychiatric treatment in 1992 and was hospitalized twice in that year at Rutland Medical Center and again in March 1995 at the Brattleboro Retreat.

See doc. # 17. At the trial, only the Plaintiff testified. Plaintiff's counsel stated that she had intended to have a physician testify in support of Congdon's case, but was unsuccessful in arranging for that testimony.

Based upon the testimony and evidence presented, the Court also makes the findings of fact. It took the Plaintiff five and a half years to complete college, and she received a Bachelor of Arts in Human Services from the College of St. Joseph in Rutland in 1999. Congdon's two children also took out student loans in their own names and they have responsibility for repaying those loans; however, the Plaintiff alone is liable for the "PLUS loans" she incurred for their educational expenses.

For the first time in her adult life, the Plaintiff is currently not employed. She consistently worked full time, or more than full-time, from 1972 to 2005. Prior to attending college, she held a variety of jobs at a bank, an electronics factory, and a resort. While attending college, she was employed full time at Westview Court, a facility that provided total care to clients. There, she earned $7.50 per hour at the outset and $10.00 per hour by the time she left. After graduation from college, she worked full-time at Sandhill Services in Castleton, a facility for delinquent adolescent girls, earning approximately $2,000 per month while continuing to work part-time at Westview Court. In January 2005, the Plaintiff found working at Sandhill to be "too intense" and "too overwhelming" because the girls' life circumstances were uncomfortably parallel to her own life. Around this time, she had what she characterized as "a

2

breakdown" that included suicidal thoughts, and was hospitalized for over a week. Soon thereafter, she quit her job at Sandhill; she had already quit her part-time job at Westview. She has not returned to work since January 2005.

Once she ceased to be employed, Congdon applied for assistance. Although she was initially denied Social Security benefits, she began receiving SSDI in June 2006 and currently receives benefits in the amount of $1,116 per month ($13,392 per year). Plaintiff's income and expenses at the time she filed her petition (September 2005), at the time she filed interrogatories (circa October 2006), and at the time of the hearing (February 2007), are set forth on Trial Exhibit 3; and were supplemented by Plaintiff's testimony.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that:

> (a) A discharge under [certain sections of the Code] does not discharge an individual debtor from any debt –
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit . . .

A student loan will not be discharged unless the debtor "affirmatively secures a hardship determination." Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004).

In the Brunner case, the Second Circuit announced the standard for "undue hardship" that this Court must apply in order for a debtor to have his or her student loans discharged as an undue hardship. The standard requires the debtor to establish that:

> (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> (3) the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396. It is the debtor's burden to prove each of the three prongs of the Brunner test. In re Lehman, 226 B.R.805, 808 (Bankr. D.Vt. 1998). If a debtor cannot satisfy each and every prong of the Brunner test, he or she is not entitled to discharge the student loan. Williams v. New York State Higher Educ. Servs. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y.2003) (quoting Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish ), 72 F.3d 298, 306 (3d Cir. 1995)); see also In re Thoms, 257 B.R.144, 148 (Bankr. S.D. N.Y. 2001); Lehman, 226 B.R. at 808. The debtor must prove her

3

case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Maulin, 190 B.R. 153 (Bankr. W.D.N.Y. 1995). The determination of undue hardship is case- and fact-specific. Id. at 156.

### A.   The "Minimum Standard" Prong

To prove the "minimum standard" prong of the Brunner test, the Plaintiff must show that she cannot, based upon her current income and expenses, both maintain a "minimal" standard of living and repay her student loans.

Congdon's current total income consists of $1,116 per month from SSDI and $250 per month from her son (for her car payment), totaling $1,366. Her current monthly expenses total $1,615, which includes $365 per month for rent, $480 per month in medical expenses and $120 per month in drug expenses, as well as other basic necessities. Although she has been living apart from her husband since 2000, she is still covered by his health insurance plan. If she remains in her current circumstances, she expects to be eligible for Medicaid in May 2007; however, she offered no evidence as to the extent her current monthly medical and drug expenses would diminish if and when she qualifies for Medicaid.

On cross-examination, ECMC offered into evidence Congdon's 2003 and 2004 federal tax returns, showing an adjusted gross income of $32,869 and $29,413, respectively, to dispute the legitimacy of the Plaintiff's projection of her future earning capacity; and filed a supplemental memorandum challenging the reliability of the figures on Exhibit 3, since they had "not been previously produced or made known to ECMC" (doc. # 21, attachment 1). ECMC also asserted that the Debtor's recent move from an efficiency to a one-bedroom apartment was unwarranted and unjustifiably increased her expenses by approximately $80 per month. This fact must be taken into account; however, the Court does not consider this additional expense in a vacuum but rather, in the context of Congdon's overall budget. Since her budget does not include expenses for clothing, recreation, or auto repairs, and she is dependent upon her family members for assistance with the auto loan payment and her health insurance, the Court does not find the Plaintiff's choice of residential unit to place her above a minimal standard of living. In response to the direct question of whether she will be able to make payments in the future, Congdon stated that "she could not do so and survive."  This testimony struck the Court as credible and persuasive.

While the "minimum standard of living test requires more than a showing of tight finances," it "does not require the [d]ebtor to demonstrate that repayment of the loan would cause [her] ... to live at or below the poverty line." In re Kelly, 351 B.R. 45, 53 (Bankr. E.D.N.Y. 2006) (citations omitted). From the testimony elicited at the evidentiary hearing, the Court finds that the Plaintiff's expenses are reasonable and frugal, and further finds that "the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself . . . if forced to repay the loans." Brunner, 831 F.2d at 396.

Therefore, the Court finds that Plaintiff has sustained her burden of proof on the first prong of the Brunner test.

### B. The "Future Prospects" Prong

As the district court in Brunner recognized, discharging a student loan, "require[s] more than a showing on the basis of current finances that loan repayment will be difficult or impossible.... '[D]ischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill [a] financial commitment.'" In re Brunner, 46 B.R. 752, 755 (S.D.N.Y. 1985) (quoting In re Briscoe, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981), aff'd 831 F.2d 395 (2d Cir.1987)). In adopting the district court's three-pronged "undue hardship" test, the Second Circuit stated: "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" Brunner, 831 F.2d at 396. This is a high standard and the Court must deny relief unless the Debtor meets it.

The Court begins its analysis of the evidence on the future prospects prong by determining whether the Plaintiff has shown any "additional circumstances impacting on the debtor's future earnings." In re Thoms, 257 B.R. 144, 149 (S.D.N.Y. 2001). Such circumstances have been described to be those where "the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the [student] loan." Id. For example, in Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 287 B.R. 132 (Bankr. D.Vt. 2001), this Court found that the debtor suffered from significant medical and emotional maladies and further found that the debtor established by a preponderance of the evidence that she would continue to suffer from these conditions. Id. at 142. The Court held that the debtor's conditions made it unlikely that she would be able to repay her student loans at any point in the foreseeable future without undue hardship. See id. at 144. In that decision, this Court emphasized that it would "closely scrutinize[ ] claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud. Well qualified and substantiated expert testimony is essential." Id. at 143 (emphasis added).

Congdon's complaint identifies several "severe medical conditions" including: "(a) anxiety and panic disorder; (b) eating and sleeping disturbances; (c) marked difficulty in concentrating and confused thinking; (d) decreased memory; (e) suicidal ideation; [and] (f) frequent urges to self-harm," which "restrict [her] abilities to perform full-time work" (doc. # 1). Her complaint also contains the allegation that, "[i]t is unlikely, given Plaintiff's numerous and severe medical conditions and long-term, ongoing treatment with unpredictable relapses, that Plaintiff will ever obtain a position that will allow her to pay her student loans." (Id.)  The issue is whether the Plaintiff has both proved these additional circumstances and established that their existence makes it hopeless that she will be able to repay the subject loans.

5

Although the Plaintiff in the instant proceeding has testified persuasively that she has significant and debilitating emotional disorders that impede her ability to obtain employment, she has not established that her future prospects are hopeless or that her inability to repay her student loan debt will continue over an extended period of time. The Plaintiff testified she would like to return to work, anticipates being able to return to work, and believes that it will enhance her self-esteem to be employed. While this testimony reveals an admirable work ethic and a strong commitment to return to work, it also makes it difficult for her to sustain her burden of proof under the second prong of the Brunner test.

The Plaintiff provided no evidence as to when she was diagnosed with the conditions and disorders itemized in the complaint. The stipulated facts set forth in the pre-trial statement indicate that she began psychiatric treatment in 1992 and was hospitalized in 1995. Given that she graduated in 1999, after taking five and a half years to complete her degree, it appears she started college in 1993 or 1994, after she had begun psychiatric treatment. Since she was aware of her ailments both when she applied for and accepted the student loans, the fact that she has psychological maladies now, in and of itself, is not sufficient to satisfy the Brunner criteria. To satisfy this prong a plaintiff must present admissible and persuasive evidence with regard to both the nature of the additional circumstances affecting the plaintiff's ability to pay the student loans and the projected duration of those additional circumstances.

### 1. *Assessment of Plaintiff's Testimony*

The only evidence offered by the Plaintiff to prove that she suffers from a variety of psychological disorders was her own testimony and a May 24, 2006 Notice of Decision from the Social Security Administration wherein an ALJ found her disabled under the Social Security Act and entitled to benefits for two years. During her testimony, Congdon referred to her emotional difficulties, described her current treatment (consisting of drug therapy, counseling, and psychiatric care) and observed that the treatments she was undergoing were helping her to deal with depression. Her treatment regimen includes attending group therapy six times per week and personal therapy once per week, seeing a psychiatrist once per month, and seeing an internist once every three months for diabetes and fibromyalgia. She suffers from low energy, and speculated that her diabetes and lack of work may be contributing to her low energy, as well a diminishing her self-esteem. She indicated that it is important to her mental health that she begin to function at a higher level. Congdon stated that the reason she is not currently working is because she "becomes overwhelmed in stressful situations," has trouble going out in public, and experiences traumatic flashbacks. Significantly, Congdon admitted that there has never been a prognosis that she would never be able to return to work, and she herself did not testify that her condition was so severe that she could never return to work. Her "work" at this time is limited to volunteering in an administrative capacity at the Sandhill facility.

Congdon's testimony about the state of her health was informative, but has only limited value.

Many courts have held that a debtor's testimony about his or her psychological or physical condition must be corroborated by some evidence that supports the debtor's position. See Lowe v. E.C.M.C. (In re Lowe), 321 B.R. 852, 859 (Bankr. N.D.Ohio 2004) ("[B]efore a medical condition may form the basis of an 'undue hardship' analysis, some corroborating evidence must be introduced to substantiate the debtor's position; an averment as to his or her medical condition by a debtor, standing alone, is insufficient."). The most salient question when assessing a mental and/or physical condition pursuant to the second Brunner prong is whether that debilitating condition is long-term, *i.e.*, expected to extend into the future such that employment is not a possibility and repayment is not an option. In Shilling v. Sallie Mae Servicing Corp. (In re Shilling), 333 B.R. 716 (Bankr.W.D.Pa. 2005), the court commented on a debtor's self-prognosis, opining:

> While we might give considerable weight to the opinion of a qualified expert concerning the expected duration of debtor's psychological disorders, debtor herself does not qualify as an expert in such matters. Moreover, because she is caught in the maelstrom of her psychological problems, debtor is not in a position to offer an objective and informed opinion concerning her future psychological condition, one that would withstand scrutiny.

Id. at 722. See Nash v. Conn. Student Loan Found. (In re Nash), 446 F.3d 188, 194 (1st Cir. 2006); Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856, 874 (Bankr. E.D.Va. 2006).

Since the Plaintiff's testimony did not demonstrate that her various medical and psychological disorders will continue to impede her ability to repay the subject student loans over an extended period of time, her testimony alone is insufficient to satisfy the second prong of the Brunner test.

### 2.   *Admissibility of Social Security ALJ's Notice of Decision*

ECMC objected to the admission of the Social Security Notice of Decision (the "Decision") granting the Plaintiff benefits as hearsay, asserting that the ALJ based the Decision upon various written materials and records submitted in a proceeding where neither Congdon, her counsel, nor her doctor appeared. At trial, the Court admitted the Decision only for the purpose of establishing the fact that a determination granting benefits was issued on the indicated date and not for the truth of the matters asserted in the Decision. The Court directed the parties to brief the issue and allowed counsel to question Congdon about the document. After considering the record, the Court admits the Decision.

In her post-hearing brief, the Plaintiff argued that the ALJ's Decision was admissible under the "public records and reports" exception to the hearsay rule set forth in Federal Rule of Evidence 803(8), adding that while the Decision did not have preclusive effect, it lent credence to Plaintiff's claims of disability (doc. # 20). ECMC countered that the reliability of the Decision should be questioned because the Plaintiff "offered virtually no information about the [Social Security] hearing itself," the proceeding was uncontested, any findings of disability were premised on hearsay, and ECMC had no opportunity to test the record at that proceeding or in the instant proceeding (doc. # 22).

7

Federal Rule of Evidence 803(8)(C) deems admissible

> [r]ecords, reports, statements or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8)(C). This rule " 'is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies.' " Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (quoting 31 Michael H. Graham, Federal Practice and Procedure § 6759, at 663-64 (Interim ed. 1992)). The rule renders presumptively admissible "not merely . . . factual determinations in the narrow sense, but also . . . conclusions or opinions that are based upon a factual investigation." Gentile v. County of Suffolk, 926 F.2d 142, 148 (2d Cir. 1991).

While this Circuit has not specifically commented on the admissibility of Social Security ALJ findings in subsequent civil proceedings, it has observed a presumption of trustworthiness, under Rule 803(8)(C), in ALJ findings based upon factual investigations and such a presumption supports admission of the Decision. In Ariza v. City of New York, 139 F.3d 132 (2d Cir. 1998), a police officer who sought admission of an Internal Affairs Bureau report argued that trustworthiness is presumed under Rule 803(8)(C) and the party opposing admission had the burden of showing untrustworthiness. There, the Second Circuit stated:

> However, before the court can presume trustworthiness, it must determine that the report contains factual findings based on a factual investigation. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) ("[T]he requirement that reports contain factual findings bars the admission of statements not based on factual investigation.") It is the methodology of factual investigation which provides a threshold safeguard against untrustworthiness. Id. It follows from this reasoning in Rainey that reports which do not contain factual findings resulting from a factual investigation are not covered by Fed.R.Evid. 803(8)(C) and its presumption of trustworthiness.

Id. at 134. Additionally, the Second Circuit held, in Henry v. Daytop Village, Inc., 42 F.3d 89 (2d Cir. 1994), that the decision of a New York State Department of Labor ALJ, while not having preclusive effect in a Title VII discrimination case in federal court, was admissible evidence under Rule 803(8)(C) which encompassed administrative proceedings. Id. at 96. Daytop Village provides some further guidance as to admissibility of an ALJ's findings.

Although a number of courts have considered the admissibility of various categories of ALJ reports in civil proceedings, this Court is aware of no decision specifically addressed the admissibility of a Social Security ALJ's findings in a bankruptcy court dischargeability proceeding. The courts that have examined the proper role of Social Security ALJ rulings in bankruptcy discharge cases have assumed the admissibility of the ALJ findings; the courts that have explored in depth whether ALJ decisions are

admissible pursuant to Rule 803(8)(C) have addressed decisions by ALJs employed by administrative agencies other than Social Security and were not bankruptcy cases. As a result, this Court will examine both groups of cases in order to formulate a standard by which to determine whether to admit the Social Security ALJ's Decision in this bankruptcy discharge case.

In those cases where the complaint sought discharge of student loan debts, the courts did not articulate the basis for admissibility, but relied upon ALJ findings for the purpose of corroborating the duration of the plaintiff's medical and/or psychological condition. For example, in Shilling, the court did not specifically rule on the admissibility of a Social Security Administration ALJ's decision determining that the debtor was disabled, but held that, in terms of the weight afforded the ALJ's conclusions, the opinion did not "suffice to demonstrate that debtor's psychological problems can be expected to persist for a substantial portion of the education loan repayment period." Shilling, 333 B.R. at 722. Accord Nash v. Conn. Student Loan Found., 330 B.R. 323, 327 (D.Mass. 2005), aff'd 446 F.3d 188 (1st Cir. 2006) (debtor's current receipt of SSI benefits insufficient to establish that she would never have the ability to pay her student loan). In addition, the Ninth Circuit in United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108 (9th Cir. 1998), upheld a bankruptcy court's admission of an ALJ's decision notifying the debtor of her receipt of disability benefits as corroborating evidence of the debtor's ongoing mental disability, noting that the defendant had not objected to this "hearsay evidence." Id. at 1113-14. See also Thomsen v. Dep't of Educ. (In re Thomsen), 234 B.R. 506, 513 (Bankr.D.Mont. 1999) (holding that continuing Veterans Administration disability pension payments constituting debtor's sole source of income served as corroboration that debtor's bipolar disorder will "in all likelihood prevent him from ever obtaining meaningful permanent employment").[2] In sum, these cases provide useful guidance with respect to the purpose for which ALJ findings may be admitted in bankruptcy proceedings, but not with respect to the standard for their admission under Rule 803(8)(C).

The second group of cases, exploring in depth whether findings by ALJs in different administrative agencies may be admitted under Rule 803(8)(C), are of somewhat limited guidance as well since they are all non-bankruptcy cases. In scrutinizing the admissibility of ALJ decisions, these courts reviewed the regulations governing the fact-finding procedures in various (non-Social Security) administrative proceedings to determine whether the ALJ decisions could be admitted in subsequent federal court civil proceedings. As one commentator has noted, "[a]dmissibility depends on the specific function of the ALJ issuing the decision, as well as the nature of the proceeding in which the decision was made." Zupanec, 19 No. 8 Fedlit 13 (Aug. 2004). For example, in Zeus Enters, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238 (4th Cir. 1999), the Fourth Circuit upheld under Rule 803(8)(C) the admissibility of a

---

[2] In Burton v. ECMC (In re Burton), 339 B.R. 856 (Bankr.E.D.Va. 2006), the bankruptcy court, in a footnote, asserted that cases that held that disability payments constituted corroboration were "in the minority," although it provided no authority for that statement. Id. at 880 n.40.

9

decision concerning airworthiness of an aircraft written by an ALJ with the National Transportation Safety Board ("NTSB"). The Court held that the ALJ's role in fact finding under the relevant regulations constituted factual findings as a result of an 'investigation,' given, *inter alia*, that each party at the NTSB hearing had an opportunity to present its evidence and cross-examine witnesses, the ALJ heard and considered testimony from adversarial parties and experts, and issued a decision that included detailed factual findings. Id. at 241. The Zeus court also distinguished findings made by a judge in the judicial branch, which would not be admissible, from those made by judges in the executive branch, which generally are admissible under Rule 803(8)(C). Id. at 242.

Five years later, a district court in the Fourth Circuit further refined the Zeus holding. In Rambus, Inc. v. Infineon Technologies, AG, 222 F.R.D. 101 (E.D.Va. 2004), the court held that the decision of a Federal Trade Commission ("FTC") ALJ could not be admitted in that action because, among other reasons, even though the fact-finding function of the FTC ALJ was similar to the one in Zeus (the court compared the rules governing the NTSB administrative action at issue in Zeus and the FTC proceeding at issue there), the ALJ's decision was not final – it was on appeal and subject to *de novo* review – and thus facts could not be said to have been found to an extent sufficient to meet the Rule 803(8)(C) hearsay exception. Id. at 108. The Rambus Court also pointed out that the trustworthiness of the FTC ALJ's report was undercut "by the absence from the FTC proceedings of the party against whom the ALJ's report is sought to be here admitted." Id.

This Court is not required to follow the complex calculus set forth in Zeus and Rambus in deciding whether to admit ALJ findings, but it does find the principles elucidated by these cases to be sound and to provide good reason for this Court to note the dramatic differences between NTSB/FTC administrative hearings and Social Security administrative hearings in its analysis herein. Social Security hearings emphasize "the informal rather than the formal." Richardson v. Perales, 402 U.S. 389, 400 (1971). See also Cleveland v. Policy Mgmt. Sys.Corp., 526 U.S. 795 (1999) (commenting that Social Security disability hearings "inevitably simplify, eliminating consideration of many differences potentially relevant to an individual's ability to perform a particular job."). They are non-adversarial, and the ALJ is duty-bound to develop the administrative record. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); United States v. Copeland, 376 F.3d 61, 71 (2d Cir. 2004); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).

The claimant seeking benefits from the Social Security Administration has a right to appear and present competent evidence, and the ALJ is required to make findings of fact based on substantial evidence found in the record. See, e.g., 20 C.F.R. §§ 404.948(b)(2), 404.950(a), 404.953(a). Various sections of the statute govern the admissibility and weight of evidence in a Social Security hearing before an ALJ. See, e.g., 5 U.S.C. §§ 556(d), (e); 42 U.S.C. §§ 405(b), (c), (g), 416(h), (i), 20 C.F.R. §§ 404.701-404.728. In this case, the ALJ's Decision contains factual findings resulting from a factual investigation,

10

where the ALJ weighed evidence concluding that Congdon was disabled against evidence that apparently argued she was not. As a result, this Court finds it appropriate to start with the premise that the Decision is trustworthy.

ECMC's challenges to the trustworthiness of the ALJ's Decision are unavailing. ECMC argues that the Decision was untrustworthy because the Social Security proceeding was uncontested, the findings of disability were premised on hearsay, and ECMC was not a party to the administrative proceeding and had no opportunity to test the record before the ALJ (doc. # 22). These objections do not demonstrate the Decision is *per se* untrustworthy. ECMC's argument that it had no opportunity to test the evidence before the ALJ misses the point. ECMC had the right in this proceeding to object to the admissibility of the Decision and to be heard on the weight to be given to the Decision. The Decision is not being admitted for any kind of preclusive finding, and therefore ECMC's due process argument is without merit.[3]  Finally, the fact that ALJs consider hearsay evidence does not diminish the reliability of their findings and lead to the conclusion that their report is untrustworthy, particularly in light of the fact that the Social Security regulations specifically allow admission of hearsay evidence. See Richardson, 402 U.S. at 410 (holding that, in Social Security hearings, "hearsay is admissible up to the point of relevancy."); Union Pacific R. Co. v. Kirby Inland Marine, Inc., 296 F.3d 671, 679 (8th Cir. 2002) (holding administrative report admissible under Rule 803(8)(C), stating "[t]he fact that . . . investigators relied on hearsay evidence to reach their conclusions does not mean that the preparation of the report was untrustworthy.").

There are extensive regulations governing the admission of evidence in Social Security disability proceedings and the manner by which an ALJ is required to arrive at a determination. Moreover, the ALJ's findings of fact and conclusions of law in the case at bar were final, as that decision was not appealed. See Barlow v. Connecticut, 319 F.Supp.2d 250, 258 (D.Ct. 2004) ("The court may consider other factors [in determining trustworthiness under Rule 803(8)(C)], including the finality of the report or record as an official finding."). From the record before this Court, it appears the Decision was prepared in such a way that its conclusions are reliable. Once that is established, a court has the discretion to determine "whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission." City of New York v. Pullman Inc., 662 F.2d 910, 914 (2d Cir. 1981).

---

[3] When evaluating the trustworthiness of a factual report, courts look to "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." Gentile, 201 F.3d at 143. Nothing about the Decision calls into question its reliability with respect to any of these factors: the ALJ appears to have issued the Decision in a timely manner (although it is difficult to determine the amount of time it took the ALJ to issue his Decision once all the documents under consideration had been submitted; there is no reason to assume that the ALJ did not possess special skills and ample experience in these matters; a hearing was not required to be held; and nothing in the record or ECMC's briefs indicates any motive on the part of the ALJ to misrepresent or misconstrue the facts presented.

This Court, in the exercise of its discretion, finds the ALJ Decision to be investigative in nature and trustworthy. It holds that the ALJ's Notice of Decision has sufficient indicia of reliability to justify its admission. Therefore, the Court admits the ALJ Decision under Rule 803(8)(C).

### 3. *Weight Accorded the ALJ's Notice of Decision*

Having found that the ALJ's Decision is admissible, the Court must now determine how much weight to accord the document. The Court concludes that the Decision is entitled to limited weight because the issues and standards involved in Congdon's Social Security proceeding are wholly distinct from the issues and standards applicable to this proceeding. The question before the ALJ was whether Congdon met the definition of "disabled" under the specific Social Security Administration regulations. The ALJ had before him a variety of medical opinions that he assessed pursuant to those regulations.[4] Here, by contrast, the Court must determine whether the Plaintiff's medical condition represents exceptional circumstances suggestive of a "continuing inability to repay [student loans] over an extended period of time." Brunner, 831 F.2d at 396. In other words, the debtor's disability must be long-term, if not permanent, and severe to the extent that it will substantially impede the debtor's ability to repay his or her student loans. This Court had none of the documents before it that the ALJ had before him. The ALJ's Decision is probative only of the issues before him and does not answer the questions that the Brunner test requires this Court to determine in the context of deciding whether the Plaintiff's student loans are eligible for discharge. In sum, the weight given the ALJ's Decision depends upon how similar the questions are that the ALJ and this Court must answer. See Fitch v. R.J. Reynolds Tobacco Co., 675 F.Supp. 133, 138 (S.D.N.Y. 1987) (holding that the findings of an ALJ are admissible evidence "to be given weight in accordance with the nature of the administrative proceeding, including the participation of the parties.").

In any event, the Decision is a double-edged sword for Congdon. While the ALJ found that Congdon suffered from "post-traumatic stress disorder, personality disorder, alcohol dependence in early full remission and fibromyalgia," the ALJ also concluded that the disability was not permanent. The Decision held that Congdon would be eligible to receive benefits only through December 31, 2008, and that "medical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in the future" (Trial Ex. 4). Courts have held that evidence showing or tending to show that a debtor had only a temporary disability is insufficient to meet the second prong of the Brunner test. See, e.g., Shilling, 333 B.R. at 722. This Court must agree. Accordingly, the Court finds that the ALJ's Decision does not show that the Plaintiff's physical, emotional, and mental problems are "likely to persist for a significant portion of the repayment period of the student loans." Brunner, 831 F.2d at 396.

---

[4] For example, the Social Security regulations require ALJs to apply the treating physician rule, which generally requires deference to the medical opinion of a claimant's treating physician. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

In this Court's view, the fatal gap in the Plaintiff's case was Congdon's failure to present any corroborating evidence that she has an impairment (or a cluster of impairments) that are likely to persist well into the future. Although the Plaintiff presented the Decision and her own assessment of her condition, she provided no supporting medical records, no prescriptions, no expert or any other testimony to corroborate her declarations or to warrant this Court's reliance on the ALJ's findings to evidence a set of conditions that would last throughout the loan repayment period.[5] In this regard, the Court reiterates its holding in Kelsey that when the condition in issue is of a psychiatric or psychological nature, the Plaintiff is required to offer, at the very least, corroborating psychological and/or medical documentation, if not persuasive expert testimony, that her disorder is expected to persist for a substantial portion of the loan repayment period in order to establish the second prong of undue hardship under Brunner.

Therefore, the Court finds the Plaintiff failed to satisfy the requirements of the future prospects component of the Brunner test.

### C.    The "Good Faith" Prong

The determination that the Plaintiff failed to establish the second prong of the Brunner test obviates the need to examine whether she made a good faith attempt to repay her loans, because Plaintiff can only prevail if she establishes all three aspects of the test. Nevertheless, in the interest of thoroughness, this Court will consider whether the Plaintiff satisfies this third prong of Brunner, which assesses her "efforts to obtain employment, maximize income, and minimize expenses." O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 564 (7th Cir. 2003). Many courts of appeal have held that a debtor's "effort to seek out loan consolidation options that make the debt less onerous is an important component of the good faith inquiry," as it "illustrates that the debtor takes her loan obligations seriously and is doing her utmost to repay them despite her unfortunate circumstances." Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 402 (4th Cir. 2005) (citing Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200, 1206 (10th Cir. 2005); Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 682-83 (6th Cir. 2005)). However, although this represents an indicia of good faith; it is not a *per se* requirement, see Cota v. U.S. Dep't of Educ. (In re Cota), 298 B.R. 408, 420 (Bankr. D.Ariz. 2003), and this Court does not deem it to be mandatory.

It is difficult for the Court to assess whether Congdon has made the necessary effort to maximize her income – which would translate to seeking employment. She is currently working as a volunteer, and there is no evidence as to whether the Plaintiff has sought or applied for part-time employment in a field

---

[5] For example, the ALJ referred to an October 2005 letter from Congdon's psychiatrist, which apparently described her symptoms and prognosis. While this Court was made aware that such evidence existed, that evidence was not offered in this case. The only documentary support for the Plaintiff's description of her medical disability was a second-hand summary of that letter in the ALJ's report. See Hertzel v. ECMC (In re Hertzel), 329 B.R. 221, 231 (6th Cir. BAP 2005) ("[W]henever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. For example, if properly authenticated, letters from a treating physician could be utilized.").

13

that would not be stressful for her. Moreover, the Court has no medical or psychological evidence upon which to assess whether the Plaintiff could hold a job at this time, given her current condition.

As noted above, the Court finds the Debtor's living expenses to be reasonable and minimal. Although ECMC emphatically criticized Congdon's recent voluntary move from an efficiency apartment to a single bedroom apartment, which increased her net monthly expenses by $80, the Court does not find that this act or expense differential compels a conclusion that Congdon failed to properly minimize her expenses.[6] Congdon also explained that the increase in medical/dental figures between her Schedule J and her current expenditures resulted from an increase in the number of medications she had to pay for and an increase in the number of groups she is currently attending. Unfortunately, the record provides no basis upon which to determine whether these expenses will remain at their current level if and when Congdon qualifies for Medicaid. Plaintiff argues that the Court should take into account that Congdon has reduced her food expenses from $200 per month to $160 per month, and that her budget shows no outlays for recreation, clothing, or automobile repair (doc. # 23). The Court has considered all of these arguments and reiterates its finding that the Plaintiff's expenses satisfy the requirement to be minimal and reasonable.

As to whether the Plaintiff has shown the requisite effort to repay her loans, the record reflects that Congdon made loan payments early on, between $200 and $300 per month for three or four years, and Exhibit 1 shows that she made a total of $3,481 in payments on her student loans. She stopped making payments when she could no longer work at her second (part-time) job, since she did not earn enough in her full-time job to pay her bills. Congdon was regularly in communication with the original lender, Vermont Student Assistance Corporation ("VSAC"), for many years. Congdon has not recently sought assistance from her college's vocational services/job placement office, and has never explored the Ford Direct Loan Program – which offers income-contingent repayment plans– as she did not know it existed. Her counsel stated that she had received information about the Ford Direct Loan Program from ECMC's counsel, but that she understood Congdon was not eligible for it because she had taken out "PLUS loans" on behalf of her children. Through post-trial briefing, it appears Congdon is eligible for benefits under the Ford program.[7] However, Congdon's failure to inquire of the lender about the refinancing,

---

[6] The Court notes that Congdon's current rent is far less than the $530 per month she was paying when she filed her bankruptcy petition in September 2005. See doc. # 1, Sch. J.

[7] In that post-trial briefing, ECMC counsel averred that "plus loans are also eligible for consolidation into a Direct Consolidation Loan." (doc. # 21, ¶ 8). The regulations governing the Direct Consolidation Loan Program allow people who qualify to obtain an income contingent repayment ("ICR") plan; counsel stated that Congdon was eligible both for a Direct Consolidation Loan and an ICR plan. Id. ¶ 11. He explained that the monthly payment under the ICR Plan was

> calculated based upon the borrower's adjusted gross income and the poverty guidelines for his/her family size. . . . [I]f the borrower's income drops, the monthly plan is reduced accordingly. If the borrower's income falls below the poverty level, the borrower pays nothing. At the end of the 25 year repayment period, any remaining unpaid balance would be cancelled by the United States Department of Education.

14

restructuring or consolidation of her student loans, alone, though unfortunate, is not sufficient to justify a finding that Congdon "lacked good faith."

The question of whether Congdon met her burden of proof under the third prong of the <u>Brunner</u> test is a close call. Taking under consideration the totality of the circumstances regarding the Plaintiff's efforts to maximize income, minimize expenses, and repay the subject loans, the Court concludes she has met the good faith standard of the <u>Brunner</u> test.

## CONCLUSION

While the Court is sympathetic to the Plaintiff's difficult life circumstances, it must base its determination as to whether to discharge the student loans on the evidence presented, and the record falls short of warranting that relief. The Court finds that the Plaintiff has not proven by a preponderance of the evidence that compelling her to repay her student loans would impose an undue hardship upon her, as required by the <u>Brunner</u> test. The Court therefore declares Plaintiff's student loans are excepted from discharge pursuant to 11 U.S.C. § 523(a)(8) and will enter an order denying Plaintiff relief and granting judgment in favor of the Defendant.

This constitutes the Court's findings of fact and conclusions of law.

_____
March 29, 2007                                         Colleen A. Brown
Rutland, Vermont                                       United States Bankruptcy Judge

---

<u>Id.</u> ¶ 13. Using the online calculator on the Department of Education website, ECMC's counsel provided calculations of what Congdon's payments would be under the ICR Plan based on her current annual income from SSI ($13,393) – a payment of $63.72 per month – and based on her 2003 income ($32,791) – a payment of $387.02 per month. <u>Id.</u> ¶ 14. The post-trial briefing makes clear, however, that whether Congdon was eligible for the ICR Plan was not easy to ascertain. Congdon's counsel provides as an exhibit a page from the website provided by ECMC's attorney showing that persons who had taken out PLUS loans were not eligible for the ICR Plan (doc. # 23, Ex. A).

15